**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Juan De Dios LEVARIO QUIROZ,
Defendant–Appellant.**

**No. 87–1662.**

United States Court of Appeals,
Fifth Circuit.

Aug. 23, 1988.

Thomas S. Morgan, Midland, Tex. (Court-appointed), for Juan De Dios Levario Quiroz.

Janet E. Bauerle, LeRoy Morgan Jahn, Asst. U.S. Attys., Helen M. Eversberg, U.S. Atty., San Antonio, Tex., for U.S.

Before GOLDBERG, GARWOOD and JOLLY, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Juan De Dios Levario Quiroz was convicted of assaulting a United States Border Patrol Officer with a deadly weapon. Levario Quiroz admitted shooting the federal officer, but claims he shot in self-defense. On appeal, he contends that the trial court erred in admitting evidence of a separate and unrelated shooting in which he also claimed self-defense. Levario Quiroz's lawyer did not object to the introduction of the extraneous offense, and we thus review this issue under the "plain error" standard. We hold that the government's introduction of the extraneous offense was highly prejudicial and constituted plain error. We

therefore reverse Levario Quiroz's conviction.

## I

The following undisputed facts were introduced at trial. On August 17, 1982, a United States Border Patrol office received information that Levario Quiroz was wanted by the Texas Sheriff's Department and was likely to cross the Rio Grande River into the United States that afternoon. Border Patrolmen Paul Conover and Stanley Spencer proceeded to the Rio Grande River and conducted surveillance of a well-known crossing. Conover and Spencer saw a boat with two men (later identified as Levario Quiroz and Juan Enrique Galindo) cross the Rio Grande River to the United States' side. The border patrolmen then attempted to follow the tracks of the individuals up a narrow trail leading from the river. Conover, walking ahead of Spencer, rounded a bend in the path and saw Levario Quiroz.

At this point the parties emphatically differ as to what occurred. Conover testified that Levario Quiroz was sitting in a metal chair cradling a rifle in his arm. Conover shouted "stop" or "freeze" in Spanish ("parada"), and Levario Quiroz began shooting at Conover. Conover was shot twice and returned fire. Conover wounded Levario Quiroz with a shot-gun blast and Levario Quiroz, seriously crippled, fled only a short distance before he was apprehended. Patrolman Spencer, although unable to see Levario Quiroz at the time of the shooting incident, stated that he heard Conover shout "parada" and then shots were fired. A number of prosecution witnesses testified concerning the circumstances of Levario Quiroz's arrest.

Levario Quiroz was his only witness. He testified that he had crossed the river to visit some friends. He stated that he was sitting in a metal chair, talking to a friend, when he heard someone yell "parada." Suddenly, he heard shots and felt several buckshot pellets hit his legs. Levario Quiroz then grabbed a rifle leaning against a tree and started returning fire. Thus, Levario Quiroz contended that he acted in self-defense.

## II

The issue on appeal is whether the district court erred in admitting evidence that Levario Quiroz had been involved in a shooting in Monahans, Texas, in which he also claimed self-defense. It is therefore important to understand this evidence in the context in which it was offered at trial.

The assistant United States attorney was cross-examining Levario Quiroz about the guns that were in his possession at the time of the Rio Grande incident. Levario Quiroz had testified that he crossed the river to have a meal with some friends and had no intention of shooting anyone.

Prosecution: Why don't you look these folks in the eye and tell them why you felt that for this friendly lunch you had to be armed to the teeth with a .45 caliber pistol and a .30 caliber pistol?

Levario Quiroz: Never, I have had problems but I never use them to kill anybody.

Prosecution: You never used these two weapons to kill someone?

Levario Quiroz: Never.

Prosecution: All right. What was Mr. Galindo carrying, how was he armed?

Levario Quiroz: He had a shotgun.

Prosecution: He had a shotgun. Was it a sawed-off shotgun?

Levario Quiroz: I don't know. I know it was a shotgun.

The prosecution then attempted to introduce a statement signed by Levario Quiroz and given to a Mexican official while Levario Quiroz was in the hospital following his capture. The prosecutor, in a bench conversation, asserted that the statement was relevant for impeachment purposes and to show Levario Quiroz's intent:

Prosecutor: Your Honor, it is time for me to get into some areas of his statement. One of the things I need to bring up, I need to ask the man, that he stated that he has never murdered anyone, with at least these two weapons. He has stated that Juan Galindo had a sawed-off shotgun as opposed to .22. He has al-

leged on his direct examination that he acted in self-defense, therefore, putting in the question of his intent and his credibility. Judge, what I would ask the Court, what Government's Exhibit 22 is, first of all, is a statement given to a Mexican Consulate which Mr. Levario Quiroz signed, which he owns up to shooting three people in Ojinaga, Mexico [this reference is an apparent mistake by the prosecutor who meant to refer to the Monahans shooting] sometime prior to this particular offense. He states that Mr. Galindo was carrying .22 and he, in fact, did shoot the Border Patrol, not Galindo but himself. He owns up to that.

The prosecution specifically argued that the extraneous shooting was relevant under Fed.R.Evid. 404(b) to show intent in shooting the border patrolman. In order to rule on the admissibility of this evidence, the trial judge removed the jury from the courtroom and then questioned Levario Quiroz concerning his statement. Levario Quiroz informed the judge that he had signed the statement under duress and while under drug sedation in the hospital. After the trial court completed its inquiry into the signed statement, the prosecutor reiterated that the Monahans shooting was relevant under Rule 404(b). Levario Quiroz's attorney stated that he had no objection to the introduction of evidence concerning the Monahans shooting. The trial court then ruled:

> You will be allowed to go, to *impeach* on the type of weapon that Galindo was purportedly carrying on August 17, 1982. You will be allowed to go into the fact whether or not he has ever told a Mexic[an] official about a shooting in Monahans, and allowed to pursue that.[1] (Emphasis added.)

The prosecutor then began questioning Levario Quiroz in the presence of the jury:

> Prosecution: Right. Okay. During that statement, did you tell that official, that fellow from Mexico, that Mr. Galin-

do was carrying a .22 rifle; do you recall that?

Levario Quiroz: I don't remember because the anesthesia, the shots they gave me, sometimes I didn't know what I was saying.

Prosecution: Do you remember telling that fellow that you shot a man in Monahans, Texas?

Levario Quiroz: I do remember that because that was the last, some of the last that they asked me and I was about to get another shot [for pain].

Prosecution: Okay. You told the fellow from Mexico that you shot a male person that you knew and had a quarrel with in the past, and as a result of the shooting, two women were also wounded; is that right?

Levario Quiroz: That same incident was in Monahans.

Prosecution: Was that self-defense when you shot those two women?

Levario Quiroz: When Corales was fighting with me, he told me he was going after his gun and a lady, one of the girls, women, was handing him the gun and that is when I shot at him and hit the two women.

> .   .   .   .   .

Prosecution: In any case, Mr. Levario, that was the first time you had to act in self-defense; is that correct?

Levario Quiroz: The first time you what?

Prosecution: The time in Monahans was the first time that you had to act in self-defense; is that correct, sir?

> .   .   .   .   .

Prosecution: Now, sir, in this case when you shot the Border Patrolman with that .30 caliber carbine, that was also self-defense, wasn't it, sir?

Levario Quiroz: Yes.

The prosecution also focused upon the Monahans shooting and the claim of self-defense during his closing argument. The prosecution stated:

1. The trial judge correctly ruled that the statement was admissible to impeach the defendant on Galindo's weapon.

Ladies and gentlemen, I don't want you to consider the Monahans case for any other reason than whether or not this man is telling you the truth when he says he is peaceable, law-abiding.[2] This man is not. He knows, he knows what happened out there and he is—no, this is not a laughing matter, but it will be such a laughing matter and he will laugh at each and every one of you if you let him, if you find him not guilty in this case.... You know, Mr. Levario–Quiroz certainly does, he certainly is consistent in his defenses.... Use your common sense. Getting back to what I was saying, Mr. Levario–Quiroz is very consistent. The shooting at Monahans, again, he is armed to the teeth, at a dance—at a dance. How many of you take guns to a dance? Well, it was self-defense then, too. This man, it is just really unfortunate, this is the most unlucky man I have ever seen in my life. Every time he steps out somebody is taking a shot at him and he has to defend himself.[3]

### III

In examining whether the trial court erred in allowing the extraneous offense testimony, we must first determine the appropriate standard of review. Since Levario Quiroz's trial counsel did not object to the extraneous offense evidence, we can only reverse the trial court if plain error exists. Fed.R.Crim.P. 52(b). As the Supreme Court has stated, this rule:

> authorizes the Court of Appeals to correct only "particularly egregious errors," those errors that "seriously affect the fairness, integrity or public reputation of judicial proceedings." In other words, the plain-error exception to the contem-

poraneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."

*United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (citations omitted). The court also cautioned that appellate courts should not review the alleged error in an isolated manner but rather should examine the entire record as a whole. *Id.*, 105 S.Ct. at 1046. In the light of *Young*, this court has stated that "in order for an error to constitute 'plain error,' it must (1) seriously affect substantial rights and (2) have an unfair prejudicial impact on the jury's deliberations." *United States v. Garza*, 807 F.2d 394, 396 (5th Cir.1986).

### A.

The government's contention at trial and on appeal is that evidence concerning the Monahans shooting was relevant under Rule 404(b) to show Levario Quiroz's intent. We therefore address only whether the extraneous evidence was admissible under Rule 404(b).

The text of Rule 404(b) states:

> **(b) Other crimes, wrongs, or acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Our court considered Rule 404(b) in *United States v. Beechum*, 582 F.2d 898 (5th Cir. 1978) (en banc), and this case has served as the cornerstone for precedents that have followed. *Beechum* establishes a two-part

---

**2.** Levario Quiroz did not testify that he was peaceable and law-abiding. He generally testified that he had no intention of harming anyone except in self-defense on the occasion of the Rio Grande shooting and that he had never killed anyone with the two guns in question.

**3.** The government has ultimately abandoned any reason for the admissibility of this extraneous offense except to show intent under Rule 404(b). The government's confusion at trial is reflected in this portion of its final argument; it

first contended that the only purpose of raising the Monahans shooting was to impeach the defendant's testimony that he was a peaceful law-abiding person. Before the prosecutor could catch his breath, however, he argued to the jury that they should consider the Monahans incident for the purpose of showing, effectively, that Levario Quiroz's conduct in the Rio Grande incident was in conformity with his conduct at Monahans, a purpose generally prohibited under Rule 404.

test for admission of extrinsic evidence: "First, it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character. Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of Rule 403." *Id.* at 911. Fed.R.Evid. 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

In applying the *Beechum* test, we first consider whether the evidence is relevant. To be relevant under *Beechum*

> the evidence sought to be admitted must tend to make the existence of some fact that is of consequence to the determination of the action either more or less probable than it would be without the evidence. Where that evidence involves an extrinsic act, its relevancy under *Beechum* is a function of the degree of similarity between the extrinsic act and the offenses charged. This means more than the existence of a common characteristic. For the purposes of the *Beechum* test, the common characteristic must be "the significant one for the purpose of the inquiry at hand." *United States v. Guerrero,* 650 F.2d 728, 733 (5th Cir.1981) (citations omitted).

The government attempts to show similarity by arguing that both the Monahans offense and the instant shooting concerned violent acts and the claim of self-defense. It is difficult for us to understand, however, how the incident at Monahans was probative of Levario Quiroz's criminal intent in the Rio Grande incident. This court has explained: "Where the issue addressed is the defendant's intent to commit the offense charged, the relevancy of the extrinsic offenses derives from the defendant's indulging himself in the same state of mind in the perpetration of both the extrinsic and charged offenses." *United States v. Satterfield,* 644 F.2d 1092, 1095 (5th Cir.1981) (*quoting United States v. Beec-*

*hum,* 582 F.2d at 911). Whether a defendant can claim self-defense for his own act of violence always depends upon the peculiar facts that surround the incident. If the factual situation surrounding Levario Quiroz in Monahans bore any resemblance to the circumstances at the Rio Grande, the government's position would be more understandable. However, the Monahans shooting arose in the context of a social setting involving women; Rio Grande involved a confrontation with law enforcement officers. Monahans involved someone whom the defendant had known before; Rio Grande involved strangers. The Monahans incident apparently built up over a period of some time; the Rio Grande incident occurred suddenly and unexpectedly. The Monahans incident occurred in a dance hall; the Rio Grande shooting occurred in a remote, desolate area. In Monahans, only Levario Quiroz fired his weapon, but at the Rio Grande there was an exchange of fire. At Monahans, Levario Quiroz admitted his adversary did not shoot first; at the Rio Grande, according to Levario Quiroz, the border patrol shot first. At Monahans Levario Quiroz was not injured by his victim; at the Rio Grande he was critically injured by his victim. Each of these circumstances is of critical importance in evaluating the claim of self-defense, yet none of these circumstances at Monahans is similar to any of these at Rio Grande. Given the almost complete absence of characteristics in common between the two incidents, we think Monahans has no relevance to show Levario Quiroz's state of mind when he was confronted by an armed person on the banks of the Rio Grande two months later.

The extrinsic evidence, to be sure, showed that Levario Quiroz previously had shot a man, and had, on that occasion as in this one, claimed self-defense. The jury was reminded of this point by the prosecutor in his closing argument. But, unfortunately, the Monahans incident was inadmissible for the purpose for which the prosecutor sought to use it. Rule 404(b) makes plain that "evidence of other crimes, wrongs, or acts is not admissible to prove

# 74

the character of a person in order to show that he acted in conformity therewith."

### B.

Having established that the Monahans shooting was not relevant, we next inquire whether this evidence constitutes plain error. As previously noted, in order to establish plain error, an appellate court must review the entire record and determine whether the extrinsic evidence affected a substantial right of the defendant and unfairly prejudiced the jury's deliberations and verdict. *See United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 1044–46, 84 L.Ed.2d 1 (1985); *United States v. Garza*, 807 F.2d 394, 396 (5th Cir.1986).

After reviewing the entire record, we are convinced that the evidentiary error here resulted in the denial of the right to an impartial verdict. A review of the record establishes that Levario Quiroz shot a federal officer and that no one contested this fact. The record also makes clear that the only disputed questions before the jury were who shot first and whether Levario Quiroz shot in self-defense. There were only two witnesses to the shooting, border patrolman Conover, and Levario Quiroz. The resolution of the case before the jury could be based on nothing more and nothing less than the personal credibility of these two witnesses: whom did the jury believe? If, for example, the jury believed Levario Quiroz's testimony that he was ambushed, shot at first and wounded, by a person he did not know, it could easily have believed that he was only defending himself against an unknown assailant who was trying to kill him; thus, the jury could have concluded that when he shot the assailant he lacked the intent to commit the crime of assaulting a federal officer. It seems to us that Levario Quiroz's contention and testimony that he shot in self-defense is altogether plausible *if* one accepts his version of the events at the Rio Grande.

We repeat ourselves in saying that the *only* question for the jury to decide was whom it should believe, Levario Quiroz or border patrolman Conover. In assessing the importance of credibility to Levario

Quiroz and the prejudice of any evidentiary error, it is fair to observe that he was significantly disadvantaged from the start. He was a Mexican who could speak little English. The jury had heard testimony that he was being sought by the sheriff for a crime. Added to these handicaps, he was asking the jury to believe his word over the testimony of a law enforcement officer. Thus, with these strikes against him, it was absolutely critical that he present to the jury all the indicia of credibility that he could call forth, in order to convince the jurors that he had acted only in self-defense.

With this critical and determinative credibility issue hanging in the balance, we have no doubt that the government's introduction of inadmissible evidence, which went to show the general character trait of committing violent acts and then claiming self-defense, was fundamentally prejudicial and undermined the impartiality of the jury's verdict on the sole question before it: whether Levario Quiroz had acted in self-defense and therefore lacked criminal intent when he shot Conover.

Furthermore, the inadmissible evidence was highly prejudicial in other ways. It showed Levario Quiroz had shot two women and, additionally, in the course of admitting the evidence, the jury heard that Levario Quiroz had been indicted for the Monahans offense.

We are therefore convinced that the prejudice caused by the introduction of the extraneous offense was an egregious error that seriously affected the "fairness, integrity or public reputation of [the] judicial proceedings." *United States v. Young*, 105 S.Ct. at 1046. When the evidentiary error is examined within the context of the entire record, we find that plain error was committed and that fundamental fairness and basic justice require the reversal of this conviction. Consequently, we reverse and remand for a new trial.

Judge GARWOOD notes his dissent.

**REVERSED AND REMANDED.**