Deborah WILLIAMS, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 53A01–9303–CR–99.

Court of Appeals of Indiana,
First District.

May 31, 1994.

William E. Daily, Daily & Worden, Indianapolis, for appellant.

Pamela Carter, Atty. Gen., Suzann Weber Lupton, Deputy Atty. Gen., Indianapolis, for appellee.

ROBERTSON, Judge.

Deborah Williams appeals her convictions of criminal confinement, a class D felony, and two counts of interference with a custody order, both class B misdemeanors. We affirm in part, reverse in part, and remand.

On January 26, 1991, Williams persuaded Angela Siebe, the college student who had been appointed to supervise Williams' visitation with her children, Meghan, then age 5, and Jaime, then age 3, to drive to Vincennes, Indiana with the children to visit a relative. When the vehicle arrived in Lawrenceville, Illinois, and Williams had picked up her mother, Williams informed Siebe that she was getting out. Siebe was left off at a motel in Vincennes, Indiana. The authorities apprehended Williams with the children in Kansas.[1]

Williams raises five issues in this appeal:

(1) whether the trial court erred by not dismissing counts II, III, and IV of the amended information when it granted Williams' motion for judgment on the evidence on these counts;

(2) whether the trial court committed reversible error by admitting evidence of extrinsic crimes;

(3) whether the trial court erred in excluding Williams' Exhibit G, a psychological evaluation of her former husband which

1. Williams subsequently maintained that her oldest daughter had been sexually abused by her father, Tom, and that she was heading to the Kempe Center in Denver to obtain treatment for herself and her daughters. In June, 1989, Williams had initiated divorce proceedings in Ohio and sought custody of the children. During the summer months of 1989, Tom Williams succeeded in obtaining court-ordered visitation, but Williams prevented him from exercising visitation on all but two or three occasions over the twelve-week period. Tom decided to seek custody himself and the Ohio court ordered a custody evaluation. Williams failed to appear for evaluation.

On the weekend of November 3, 1989, when the single incident of child molesting is alleged to have occurred, Tom, who had been residing in Bloomington, Indiana, took only his older daughter for visitation. Williams prematurely ended the visitation with the news that her grandmother was near the point of death and she needed to take Meghan with her to Illinois. Instead, Williams returned to Cincinnati, Ohio, and then moved to Kentucky where she enrolled Meghan in school and five days later took her to see a physician. At a Kentucky medical center, Meghan reported that her father had gotten in bed with her unclothed and "peed" on her. No investigation by police followed the report, perhaps because Williams did not remain long in Kentucky.

Over the next two months, Williams apparently resided in Kentucky, visited friends in New Mexico, moved to Clinton, Illinois, where her grandmother died, and then moved on to Colorado where she initiated new divorce proceedings. Tom meanwhile returned to the Ohio courts. He was refused custody of the children; however, his parents were awarded custody temporarily until an investigation of the allegation could be conducted. Tom's father went to Illinois for the children, but Williams had obtained a protective order from an Illinois court and the police would not release the children to their grandparents. The Ohio court held Williams in contempt.

Sometime in March, 1990, the Colorado court began to consider whether it had jurisdiction over the domestic issues. Tom appeared and the parties worked out an agreement which required Williams to return to the marital home in Cincinnati, Ohio by April 16, 1990. The Ohio domestic relations judge would recuse himself and a new judge would be appointed, the contempt citation against Williams would be dropped, and a new custody investigation would be commenced. In the interim, Williams would have custody and Tom would have supervised visitation. Tom was to pay all outstanding bills on the marital residence and one-half of defendant Williams' moving expenses. It appears he did so, but Williams again failed to appear with the children. At a hearing in May, 1990, Williams, who had been ordered to appear with the children, again disregarded the court's order. When the newly appointed judge asked Williams for a phone number so that she could have the children brought, Williams gave the judge an incorrect number. She was immediately incarcerated.

In June, 1990, after alternative arrangements for custody had failed, the Ohio court considered placing the children in foster care. Tom's parents intervened and were again temporarily granted custody. Tom received unsupervised visitation while Williams was permitted supervised visitation. At the time of the charged offenses, some seven months later, this was the court-ordered custody arrangement. The Ohio court conducted an investigation of both parents which turned out to be unfavorable to Williams. The allegations of child molesting were apparently never substantiated. At the time of the criminal trial in November, 1991, proceedings were pending in Ohio and had been initiated in Monroe County, Indiana by Williams.

had been prepared by his former employer;

(4) whether the evidence is sufficient to sustain Williams' convictions of each of the three counts; and,

(5) whether the trial court erred in imposing consecutive sentences without specifically articulating its reasons.

## I.

Williams argues that the trial court erred in refusing to dismiss counts II, III, and IV of the information which charged Williams with three distinct acts of confinement. She argues that further prosecution on these counts would subject her to double jeopardy because the court granted her motion for judgment on the evidence as to the three counts at the close of the State's case in chief, finding that the evidence did not show venue to lie in Monroe County.

The record supports Williams' assertion that the trial court did in fact withdraw the counts from the jury's consideration and granted Williams' "written motion which is designated as defendant's motion for judgment on the evidence ... as to Counts Two, Three and Four." [2] But, the court also deferred dismissal of the counts "pending further pleadings filed in the cause relating to any possible transfer to the county having proper venue." Neither party thereafter filed any pleadings to request or object to a transfer or to obtain a dismissal.

We are squarely presented with the question of whether a criminal defendant may be tried a second time when a trial court has determined, after the State's case in chief, that the State has failed to meet its burden of proving that the offenses charged occurred in the county identified in the charging instrument. The Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding. *Tibbs v. Florida* (1982), 457 U.S. 31, 41, 102 S.Ct. 2211, 2217, 72 L.Ed.2d 652.

> This prohibition, lying at the core of the Clause's protections, prevents the State from honing its trial strategies and perfecting its evidence through successive attempts at conviction. Repeated prosecutorial sallies would unfairly burden the defendant and create a risk of conviction through sheer governmental perseverance.

*Id.* (Citations omitted).

A judgment of acquittal is especial in the jurisprudence of the Double Jeopardy Clause. *Id.* Even where an acquittal is "based upon an egregiously erroneous foundation," a defendant may not be retried for the same offense. *Sanabria v. United States* (1978), 437 U.S. 54, 65, 98 S.Ct. 2170, 2179, 57 L.Ed.2d 43. Indeed, historically, "the most fundamental rule" has been that " '[a] verdict of acquittal ... [may] not [even] be reviewed ... without putting [the defendant] twice in jeopardy and thereby violating the Constitution.' " *United States v. Martin Linen Supply Co.* (1977), 430 U.S. 564, 571, 97 S.Ct. 1349, 1354, 51 L.Ed.2d 642.

---

**2.** The court's colloquy with the jury sheds some light on the court's view of its ruling:

Also you need to understand that outside your presence at the conclusion of the State's evidence the defendant has made certain motions which I must consider. Part of those motions are a motion which asks that I take from you the right to make a decision of guilt or innocence in Counts Two, Three and Four. If you recall my preliminary instructions those three counts had to do with the offense of confinement as a Class D Felony. Under the section of the confinement statue (sic) that makes it a Class D Felony for a person to knowingly or intentionally confine another person without the other person's consent. Also as a part of the proof that must be criminal case (sic) there must be proof that the offense within (sic) the

county in which it is being tried. After considering the evidence presented by the State I have determined that if an offense did in fact occur against the consent of Angela Siebe or the kids who were in her custodial care at that time. That lack of consent did not occur in this county because she agreed to leave this county with the kids. If the offense occurred at all it occurred either in Knox county, Indiana, which is the county of Vincennes or it occurred in Lawrence, Illinois the county in which I am not aware. It (sic) any event, venue is the important and necessary element of any criminal offense and if there is any consentual (sic) leaving of this county, it is my opinion that the case cannot be prosecuted in this county but must be taken the (sic) another county of prosecution is pursued...."

■ We therefore direct our attention to the constitutional significance of the ruling made in the present case. Whether the trial court's action constitutes an acquittal for purposes of the Double Jeopardy Clause is not to be ascertained from the form of the judge's action, *id.* at 572, 97 S.Ct. at 1355, although the form of the order entered by the trial court should not be ignored, *Sanabria,* 437 U.S. at 67, 98 S.Ct. at 2180, but rather by determining whether the substance of the ruling, whatever its label, actually represents a resolution, correct or not, of some or all of the factual elements of the offense charged. *Martin Linen Supply Co.,* 430 U.S. at 571, 97 S.Ct. at 1354; *State v. Lewis* (1989), Ind., 543 N.E.2d 1116, 1118.

■ Williams requested that the trial court grant her a judgment on the evidence pursuant to Ind.Trial Rule 50 and the court expressly did so. The trial rule provides that where some of the issues tried before a jury are not supported by sufficient evidence, the court shall withdraw such issues from the jury and enter judgment thereon. A judgment entered pursuant to the rule is explicitly intended to terminate a pending proceeding following the completed presentation of evidence by the party having the burden of proof, for the rule provides that "*a judgment shall be entered* thereon." This means that in a criminal prosecution an "acquittal" as defined for purposes of the Double Jeopardy Clause may take the form of a judgment on the evidence in Indiana.

■ Nonetheless, the judgments on the evidence entered here were acquittals in substance as well as form. As the court's colloquy with the jury elucidates, the court granted Williams' motion on the ground that the State had not proved venue, a necessary fact in any criminal conviction in Indiana.[3] The court evaluated the State's evidence and determined it to be legally insufficient to permit a conviction in Monroe County. Whether or not the counts were dismissed or the court's ruling was correct, the court's action brought an end to the jeopardy which had attached when the first witness was sworn before this particular jury.

Williams may not now be retried. "The Double Jeopardy Clause is not such a fragile guarantee . . . that its limitations [can be avoided] by the simple expedient of dividing a single crime into a series of temporal or spacial units." *Sanabria,* 437 U.S. at 72, 98 S.Ct. at 2183. We direct that counts two, three and four of the information be dismissed.

## II.

■ Williams challenges the admission of evidence she attempted to hire someone to kill her former husband. The State sought admission of the evidence on the ground it tended to show consciousness of guilt.[4]

■ The State first brought the evidence to the jury's attention during cross-examination of Williams, after Williams had made her state of mind an issue, by asking Williams how many people she had attempted to hire to kill her former husband. After a second question on the topic, Williams voiced the following belated objection:[5] "Your Honor,

3. In Indiana, venue is not an element of a criminal offense, *Sizemore v. State* (1979), 272 Ind. 26, 395 N.E.2d 783, 786, but it is an essential fact which must be proved by the State in the same manner as the essential elements of the crime as defined by the legislature, though only by a preponderance of the evidence. *Campbell v. State* (1986), Ind., 500 N.E.2d 174, 178. A claim on appeal that the evidence is insufficient to prove venue is treated in the same manner as other claims of insufficient evidence. *Id.* This is so because in Indiana a criminal defendant has a constitutional right to be tried in the county in which the crime was committed. *Id.* (citing Ind. Constitution, art. I, § 13).

4. The State tried Williams in November, 1992. At that time, the Indiana Supreme Court had adopted Federal Rule of Evidence 404(b) as the means for testing the admissibility of evidence of other crimes, wrongs or acts. *Lannan v. State* (1992), Ind., 600 N.E.2d 1334, 1339. Indiana's own rule, modeled after the federal rule, had not yet been adopted. The parties and the trial court analyzed the issue by applying existing Indiana evidentiary law which permitted the introduction of evidence of spoliation to prove consciousness of guilt.

5. The State's witness testified concerning the plot to kill Tom Williams in rebuttal without any new objection from Williams. Thereafter, the State called Gary Cushinberry who testified that he had become acquainted with Williams through his employment and that Williams had discussed a plan to have her children kidnapped. Cushin-

for the record I would in the courts ruling would like to know if I could continue an objection for the record." The court granted Williams' request, though a specific ground for the objection was never stated and no clear reference was made to the court's earlier ruling. Since the objection did not refer to any specific motion by Williams, it is not sufficiently specific to preserve any alleged error for appellate review. *Cf. Johnson v. State* (1985), Ind., 472 N.E.2d 892, 904. *Cf.* Ind.Evidence Rule 103(a) (Error may not be predicated upon a ruling which admits evidence unless a substantial right is affected and a timely objection or motion to strike appears of record stating the specific ground of objection if the specific ground is not apparent from context).

■ On appeal, Williams acknowledges that she may not have adequately preserved error. However, she maintains that the error is fundamental in nature, and thus, despite her procedural default, is available for review. As a general rule, the erroneous admission of evidence of extrinsic acts is not fundamental error. *See e.g. Lewis v. State* (1987), Ind., 511 N.E.2d 1054; *Greentree v. State* (1976), 265 Ind. 47, 351 N.E.2d 25; *Stout v. State* (1993), Ind.App., 612 N.E.2d 1076, *trans. denied; Ried v. State* (1993),

Ind.App., 610 N.E.2d 275; *Dorsey v. State* (1977), 171 Ind.App. 408, 357 N.E.2d 280.

Whether or not the evidence was properly admitted under Federal Rule of Evidence 404(b),[6] and its erroneous admission rises to the level of fundamental error, it is our conclusion that the admission of the evidence in this case was harmless.

No error in the admission of evidence is ground for setting aside a conviction unless such erroneous admission appears inconsistent with substantial justice or affects the substantial rights of the parties. Ind.Trial Rule 61. The improper admission of evidence is harmless error when the conviction is supported by such substantial independent evidence of guilt as to satisfy the reviewing court that there is no substantial likelihood that the questioned evidence contributed to the conviction. *Jaske v. State* (1989), Ind., 539 N.E.2d 14, 22. To decide if the erroneous admission of prejudicial evidence of extrinsic offenses is harmless, we therefore evaluate whether the jury's verdict was substantially swayed. *Hardin* [*v. State* (1993), Ind.], 611 N.E.2d [123,] 132.

*Wickizer v. State* (1993), Ind., 626 N.E.2d 795, 800–01.

---

berry told the jury Williams had wanted her former husband hurt.

Williams voiced no objection to any of Cushinberry's testimony. Cushinberry's testimony was not discussed during the pretrial briefing. Williams does not dispute the admissibility of Cushinberry's testimony on appeal.

At the close of the evidence, the trial court proposed an instruction which referred to the State's evidence "indicating that the defendant may have attempted to hire a person, or persons, to kill the state's witness, Tom Williams" which directed the jury not to find the defendant guilty of any charged offense simply because it believed the evidence to be true but that the evidence could be considered in determining the guilty knowledge, or consciousness of guilt the defendant harbored in her mind. Williams specifically stated that she had no objection to any of the court's proposed instructions and the jury was so instructed.

**6.** The federal courts generally permit evidence of this nature to be admitted under Federal Rule of Evidence 404(b) as evidence of guilty knowledge. But, as Williams points out, the State offered no proof tending to show that Williams sought to

kill her former husband because he would be a witness against her in these proceedings; hence, as evidence of spoliation, its probative value was slight.

The evidence also tends to show Williams' motive with respect to the charged offense to be one of vindictiveness, *cf. Haggenjos v. State* (1982), Ind., 441 N.E.2d 430, and is logically relevant to prove intent, the permitted inference being that the absence of good faith or objective reasonableness on the subsequent occasion made it more probable that Williams did not act upon a good faith belief which was reasonable under the circumstances on the charged occasion. But to be admissible, the evidence must survive the balancing test of Federal Rule of Evidence 403. *Hardin v. State* (1993), Ind., 611 N.E.2d 123. We are not convinced that it does. In retrospect, the need for the evidence was not great, particularly in light of the amount of other evidence tending to show Williams to be motivated by ill will and the probable absence of good faith, yet its tendency to reflect poorly upon Williams' character, in isolation from the other evidence of record, was substantially likely, Williams having contemplated murder and actively solicited someone to carry it out.

Williams admitted the essential facts constituting the elements of confinement and interference with a custody order but testified she believed her former husband to have molested their older daughter, and when the judicial system would not protect the girls from their father, it became necessary for her to remove them and obtain treatment for them. Williams obtained an instruction on her defense of necessity. The jury was instructed, in part, that "[t]he evidence must show a good faith belief of [immediate] peril on the part of the defendant which is reasonable under all of the facts and circumstances of the case." Williams thus claimed that when she took her children, confined Siebe, and interfered with her former husband's visitation, she in good faith believed that her children were in immediate danger and that under the circumstances this belief was objectively reasonable.

The State's burden of proof therefore required that it prove the absence of good faith and objective reasonableness. Williams' necessity defense put these matters genuinely in issue. Hence, we focus first upon whether the State offered such substantial independent evidence of intent, that is, the absence of good faith and objective reasonableness, as to satisfy us that there is no substantial likelihood that the questioned evidence contributed to the verdict. We find considerable evidence in a variety of forms, independent of the possibly objectionable evidence, which establishes that when Williams committed the charged offenses she did not actually believe her immediate action was required to avoid a threat of child molesting. Likewise, there is substantial independent evidence that such a belief would not have been objectively reasonable under the circumstances.

First, we note that there is a total absence of any evidence, apart from Williams' generalized assertion and other than the single allegation made in Kentucky by Meghan, that Tom Williams had ever molested either of the girls or abused them or Williams physically or verbally. State Police Officer Hays testified that at the request of Williams, he and a Monroe County caseworker investigated the allegations when the children were in the custody of Tom Williams' parents in Bloomington and could not substantiate the allegations. Meghan denied that the incident ever occurred. Meghan's pediatrician testified that neither Williams child exhibited any signs of long term sexual abuse and numerous witnesses, including the pediatrician, the girls' teachers and Williams' own witnesses, observed no behavioral or emotional signs of abuse. A number of witnesses, including the domestic relations judge in Ohio who interviewed the girls in camera, concluded based upon their observations and conversations with the girls, that the girls preferred to be with their father. Williams herself did not relate any other specific instances of harm either to herself or the girls and there is no evidence of any contemporaneous event which might lead a reasonably cautious person to suspect that abuse was imminent. There is similarly no evidence that counseling for past abuse, assuming it occurred, would not be available in Monroe County, Indiana.

The history of the divorce/custody proceedings provides strong circumstantial proof that Williams was motivated not by a belief that her children were in danger, but by the possibility that she ultimately would lose custody. By the time sexual abuse had been alleged, Williams had repeatedly violated the Ohio court's orders concerning visitation without any justification. She had failed to submit to a custody investigation. Rather than cooperate with a thorough investigation of the allegation of sexual abuse by the Ohio courts or the police, or to seek treatment for her daughter, Williams moved from jurisdiction to jurisdiction, refusing to honor any of the Ohio court's orders, even those which permitted Tom supervised visitation or placed the children in the custody of someone else, and effectively used the judicial system as a means of preventing anyone else from obtaining custody of the children.

The State offered a substantial amount of evidence tending to reflect unfavorably upon the credibility of Williams' assertion she genuinely believed her children were at risk of imminent harm. There are the reports from the two Ohio psychologists who interviewed all of the people concerned and observed Williams and the children on multiple occa-

sions. Dr. Hardings reported to the Ohio court that in his opinion, Williams probably suffered from a bipolar aspective "sic" disorder with an underlying personality disorder characterized by paranoid and histrionic traits. He found her to be untrustworthy in reporting on herself and her intentions and opined that she "falsifies and exaggerates events in order to tell her interpretations in her direction." He also concluded that Williams' reasoning was distorted. Dr. Zuberbuhler likewise reported that Williams was prone to exaggeration.

Dr. Hardings apparently could not substantiate Williams' assertions that Tom was a drug abuser and alcoholic, and Williams offered no such proof other than her own assertions. Tom Williams does not have a record of drug or alcohol related convictions, though he admitted smoking marijuana in college, and did not fit the psychological profile of either an alcoholic or abuser.

Then there is the evidence of Williams' prior offenses of auto theft, shoplifting and driving while intoxicated, for which she placed the blame upon Tom, and the theft of her roommate's driver's license the day of the charged offense. There is Williams' statement to the Ohio judge that her children were at a particular place when they were not and the incorrect phone number she gave to the judge as well as the explanation she gave for not returning to Ohio as she had agreed, that Tom had not paid all of the utilities or given her money in time, which was disproved at trial.

Lastly, in terms of the evidence probative of Williams' state of mind, there is the very substantial quantity of evidence similar to that which Williams argues was erroneously admitted, which both tends to reflect poorly upon Williams' character but nevertheless is probative of her true mental state and motives: the threats to kidnap the children in August or September, 1990, and Dr. Hardings' prediction from his evaluation of Williams that she was at risk of taking the children and could not be trusted to honor court-order visitation; the plan to kidnap the children discussed with Gary Cushinberry; the explicit and implicit threats to kill Tom's parents, the children, and Officer Hays, whose only role had been to determine whether the allegations of abuse could be substantiated; the bizarre mutilation of Coach Knight's picture at Tom's parents' house; the "exaggerated, pervasive, and destructive" vilification of Tom and his family reported by Dr. Hardings; the belittling of Tom and his parents to the children reported by Angela Siebe; the public disparaging of Tom as a child molester, his family, and Officer Hays in church, the newspaper, and flyers created in such a manner as to appear to be upon the letterhead of a Columbus attorney who had spoken to Williams for only twenty minutes; the stalking of Tom's parents; and, the surveillance of the children's day care and school.

These extrinsic acts, while probative of Williams' culpability, also lessen the impact of the evidence Williams argues was erroneously admitted. Williams had made so many other serious threats and engaged in so many other acts of a vindictive nature that it is unlikely the jury could have been substantially swayed by the evidence that she had actually solicited someone to carry out her threat. She had solicited the aid of numerous other persons as a means of getting back at Tom. Hence, while the evidence Williams tried to hire someone to kill her husband in isolation might be so harmful as to outweigh its relevance, the harm is greatly diminished by the other evidence of like character.

Finally, we note that the jury was instructed to use the erroneously admitted evidence solely for the proper purpose of inferring intent. The giving of this instruction reduces the risk that Williams would be convicted because she was of bad character.

We readily admitted that Williams offered a viable defense complete with expert witnesses who believed her to be a victim of spousal abuse. Nonetheless, on the state of the entire record before us we conclude that error if any in the admission of the extrinsic evidence identified by Williams did not contribute to the verdict.

### III.

Williams contends the trial court committed reversible error by excluding Ex-

hibit G, a psychological profile of Williams' former husband, which had been prepared by his employer in November, 1987 as a means of evaluating Tom Williams' strengths and weaknesses as an employee. The trial court excluded the document because it was "not material to the issues in both time and content." Evidence is relevant if it has a logical tendency to prove or disprove a material fact in issue. *Jackson v. State* (1986), Ind., 490 N.E.2d 1115, 1117. Williams maintains that the document should have been admitted because it tended to substantiate her claim of battered wife syndrome, and somehow indirectly, her necessity defense. We agree with the trial court that the exhibit was not relevant to any material issue in the case.

Much of the exhibit is directed at Tom Williams' intelligence, aptitudes, interests and goals. However, selectively, under the caption *"Human Relations and Personality Adjustments,"* the evaluator reports that Tom "is, or has the need to be, quite outgoing, aggressive and dominant." According to the examiner, his even temperament stems too much from forced control rather than a true understanding of those with whom he feels uncomfortable. The evaluator opines that Tom has made an average personality adjustment for operating in the adult world but reports that he is having some difficulty making the transaction from campus leader to the greater resistance that can be expected in the business world, and is falling into a pattern of blame projection. He is already developing excess resentment towards criticism and close control. "Rather than growing beyond this level of maturity, he is compensating by preferring to avoid situations where differences of opinion, contention or conflict exists."

Contrary to Williams' assertions, this document does not have any tendency to prove that Tom Williams fits into the profile of a wife or child abuser. It was never intended to describe the characteristics of an abuser, evaluate Tom's personality with respect to those characteristics or assess his parenting skills. Moreover, when the document is viewed as a whole and the evaluator's statements are not removed from the context in which they were made, the exhibit portrays

Tom as one who has an even temperament, exercises control, and prefers to avoid situations where conflict exists, rather than one who strikes out, suggesting an inference entirely contrary to that sought by Williams. The document's tendency to prove that Williams possessed a genuine belief which was reasonable under the circumstances is very slight at best.

The trial court has broad discretion in its rulings on the admissibility of evidence. The trial court's decision to exclude evidence which is arguably relevant will not be reversed unless there is a showing that the trial court's discretion was manifestly abused and that the defendant was denied a fair trial. *Id.* at 1118. Plainly, Williams was not denied a fair trial by the exclusion of Exhibit G. The exclusion of the exhibit was not clearly against the logic and effect of the facts and circumstances before the court.

## IV.

The State succeeded in convicting Williams of one count of criminal confinement as a class D felony, I.C. 35–42–3–3(2), and two counts of interference with a custody order, class B misdemeanors, I.C. 35–42–3–4(b)(2). Williams maintains that the State failed to prove all of the elements necessary for conviction of criminal confinement in that the State failed to prove that Angela Siebe was removed from Bloomington by fraud, and that with respect to all three counts, she should have prevailed with her necessity defense.

In reviewing a claim of insufficient evidence, this court does not reweigh the evidence nor judge the credibility of witnesses, but will consider that evidence most favorable to the State and all reasonable inferences to be drawn therefrom. Where there is substantial evidence of probative value to support the jury's finding, the conviction will not be disturbed. *Thomas v. State* (1988), Ind., 519 N.E.2d 143, 144–45.

The State alleged that on or about January 26, 1991, in Monroe County, Indiana, Deborah Rae Ballard/Williams did knowingly or intentionally remove Angela Siebe from Bloomington, Indiana, to Vincennes, Indiana,

by fraud, to wit: stating she was going to visit a relative, which statement was untrue, in violation of I.C. 35–42–3–3. The State's proof did in fact show that Williams removed Siebe from Bloomington to Vincennes by deceit or trickery as alleged.

Angela Siebe, who supervised Williams' visitation with her children testified that when she picked Williams up at a Bloomington motel on January 26, 1991, for visitation with her children, Williams told Siebe that her cousin or uncle Eddie, who was in the reserves, had been called up to go to Desert Storm and that she would like to go to Vincennes to have supper with him before he left. Williams had checked with the Indiana State Police and the roads were fine. They would go to Vincennes, have dinner with the family, and then return. The evidence shows that instead Williams drove to Illinois, where they picked up Williams' mother. The evidence thus shows that Williams removed Siebe by convincing her that they were going to Vincennes to visit a relative, specifically cousin or uncle Eddie, a representation which was untrue. Indeed, on cross-examination, Williams admitted that she told Siebe the truth when she got to Illinois and that it was her intent to deceive Siebe. That the evidence shows Williams, Siebe and the children did eventually meet up with Williams' mother, a relative, does not in any way alter the state of the record, which contains sufficient proof of the crime as alleged.

As to Williams' more general claim of insufficiency, we hold that the evidence is ample to sustain the jury's conclusion and direct Williams to our discussion of harmless error in issue II.

### V.

The record reflects that the trial court failed to articulate any reason for imposing consecutive sentences. The State concedes that when consecutive sentences are imposed, a sentencing statement containing the reasons for the imposition of consecutive sentencing is required. *Lindsey v. State* (1985), Ind., 485 N.E.2d 102, 108. Where the trial court does not give a sufficient statement of reasons for imposing consecutive sentences, the proper remedy is to remand the cause with instructions that the trial court either enter any findings which support the consecutive sentences, or, alternatively, resentence appellant to concurrent terms. *Id.* We so order.

The cause is remanded for correction of sentence and for dismissal of counts II, III, and IV. In all other respects, the judgment is affirmed.

SHARPNACK, C.J., and NAJAM, J., concur.