Chad Leroy **GOODWIN**, Appellant–Defendant,

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 82A01–0112–CR–00483.

Court of Appeals of Indiana.

Nov. 8, 2002.

Jon Aarstad, Vanderburgh County Public Defender Agency, Evansville, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Richard C. Webster, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

VAIDIK, Judge.

### Case Summary

Chad Leroy Goodwin appeals his conviction for Armed Robbery as a Class B felony.[1] Goodwin argues that numerous references during his trial to other misconduct deprived him of his right to a fair trial. Goodwin also argues that the Prosecution's comments during closing argument deprived him of a fair trial. Because we conclude that introduction of improper character evidence in this case constituted fundamental error, we reverse Goodwin's conviction and remand for a new trial.

### Facts and Procedural History

On August 5, 2001, Goodwin expressed to a number of friends who were staying at his house his desire to rob the Pantry store in Evansville, Indiana. Goodwin told Travis Kiselewski that he needed money so he was going to rob the Pantry. Goodwin also told Robert Ohning that he was going to rob the Pantry. In addition, Goodwin asked his then girlfriend, Amanda VanScyoc, where a deserted Pantry was located and if he could get a car ride to the store because he wanted to rob it. However, none of his friends provided him with a ride to the Pantry, so Goodwin had to go about robbing the store on his own.

At about 2:30 a.m. on August 6, 2001, Goodwin entered the Pantry and told Linda Alldredge, the only employee on duty in the store, "I want to rob you if that's all right." Tr. p. 3. Goodwin was wearing a light gray hooded-sweatshirt with a blue bandanna covering the lower part of his face and black electrical tape on his fingertips. Goodwin was carrying a big wooden stick, which was probably part of a pool cue. After Goodwin unsuccessfully tried to open the store's cash register, Alldredge opened it for him. Goodwin took between $50 and $60 from the register and a number of cigarette packs. Goodwin then became agitated when he could not resolve what to do with Alldredge. While Alldredge did not feel particularly intimidated by her robber, she followed his directions and positioned herself in the store's bathroom in order for Goodwin to make his escape. Upon hearing the store's door buzzer go off when Goodwin left the building, Alldredge got out of the bathroom and called 911 to report the robbery.

After the robbery was complete, Goodwin returned to his home where he bragged to VanScyoc, Ohning, and Kiselewski about the robbery. Goodwin showed them the stolen money and cigarettes and even gave out some of the cigarette packs. Goodwin described the robbery to Kiselewski telling him that:

> [H]e wore a black hood, a bandanna. He told me he was on foot and bicycle. He used the fat end of a pool stick. He said he taped his fingertips with black electrical tape so no fingerprints. He told me he hit her in the head with the stick and dragged her in the bathroom and then took the money. . . . Threw the stick in the trash can and the hood I

---

1. Ind.Code § 35–42–5–1.

guess or whatever, the bandanna. He got rid of everything.

Tr. p. 60–61. Goodwin told a similar story to VanScyoc except in that version he locked the attendant in a freezer. Tr. p. 36.

Unfortunately for Goodwin, boasting to friends proved to be his undoing. Kiselewski was arrested later in the day on August 6 on an unrelated case, and he promptly told Officer Doug Hamner of the Evansville police department that he knew that Goodwin robbed the Pantry. When Officer Hamner went to Goodwin's house to investigate, Goodwin allowed him into the home. Officer Hamner observed two blue bandannas hanging on the wall of Goodwin's bedroom and a black pool cue case containing only the top half of a pool cue. Officer Hamner took Goodwin into custody. Later, Alldredge went to the police station and identified Goodwin out of a photographic array as the robber.

On August 9, 2001, the State charged Goodwin with armed robbery. Goodwin's jury trial was held on October 15–16, 2001. On October 16, 2001, the jury returned its verdict finding Goodwin guilty of armed robbery. On November 27, 2001, the trial court sentenced Goodwin to an executed sentence of ten years. This appeal ensued.

### Discussion and Decision

Goodwin asserts that a fair trial was impossible in his case because of the numerous references to his past misdeeds. In addition, Goodwin contends that he was deprived of a fair trial by comments made by the Prosecution during closing arguments asking the jury to return a guilty verdict in order to "[h]elp the State help him help himself. It's the best thing for him." Tr. p. 170. Because we find the issue concerning the admission of character evidence to be dispositive, it is unnecessary for us to address Goodwin's argument surrounding the Prosecution's closing argument.

Goodwin argues that he was deprived of his right to a fair trial because improper character evidence was admitted. The admission or exclusion of evidence is a matter left to the sound discretion of the trial court, and we will reverse only upon abuse of that discretion. *Craun v. State*, 762 N.E.2d 230, 236 (Ind.Ct.App.2002), *trans. denied*. In determining admissibility of evidence, the reviewing court will only consider the evidence in favor of the trial court's ruling and unrefuted evidence in the defendant's favor. *Dumes v. State*, 718 N.E.2d 1171, 1174 (Ind.Ct.App.1999), *supplemented on reh'g by* 723 N.E.2d 460 (Ind.Ct.App.2000).

Indiana Evidence Rule 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident...." *See also Thompson v. State*, 690 N.E.2d 224, 229 (Ind.1997); *Moore v. State*, 653 N.E.2d 1010, 1015 (Ind.Ct.App.1995), *reh'g denied, trans. denied*. The well-established rationale behind Evidence Rule 404(b) is that the jury is precluded from making the "forbidden inference" that the defendant had a criminal propensity and therefore engaged in the charged conduct. *Thompson*, 690 N.E.2d at 233.

In evaluating the admissibility of evidence under Evidence Rule 404(b), a trial court must (1) decide if the evidence of other crimes, wrongs, or acts is relevant to a matter other than the defendant's propensity to commit the charged act; and (2) balance the probative value of the evidence against its prejudicial effect pursu-

ant to Indiana Evidence Rule 403. *Craun,* 762 N.E.2d at 236. Even if evidence of prior bad acts is admissible, its probative value must still be weighed against the unfair prejudice against a defendant that its admission may cause. *Jones v. State,* 708 N.E.2d 37, 40 (Ind.Ct.App.1999) (citing Ind. Evidence Rule 403), *trans. denied.* Evidence of prior, uncharged bad acts can be highly and unfairly prejudicial, requiring an accused to defend both against the charged crime and the alleged uncharged misconduct. *Lay v. State,* 659 N.E.2d 1005, 1009 (Ind.1995), *reh'g denied.*

▇▇▇ In this case, Goodwin's criminal history was first presented to the jury during his cross-examination of VanScyoc. While asking VanScyoc why she did not take Goodwin seriously when he first announced that he planned to rob the Pantry, the following exchange occurred:

Q. Did you ever know him to do anything like that during the time that you were dating?

A. I had known him to break into cars and do little things but I've never known him to actually rob a Pantry.

Tr. p. 47–48. Goodwin does not protest the admission of this evidence of his prior misdeeds; indeed, because he was the one that induced this response, he cannot claim that it warrants reversal. A party may not invite error, then later argue that the error supports reversal, because error invited by the complaining party is not reversible error. *Kingery v. State,* 659 N.E.2d 490, 495 (Ind.1995), *reh'g denied.* This type of invited error is not fundamental error. *Id.*

▇▇▇ However, while VanScyoc's comment about Goodwin's prior misdeeds on cross-examination did not warrant reversal, it also did not open the door on redirect examination to further inquiry by the Prosecution into those misdeeds. Although otherwise inadmissible evidence

under Rule 404(b) may become admissible where the defendant "opens the door" to questioning on that evidence, the "evidence relied upon to 'open the door' must leave the trier of fact with a false or misleading impression of the facts related." *Ortiz v. State,* 741 N.E.2d 1203, 1208 (Ind.2001). In this case, the jury was not left with a false impression because VanScyoc's comment about Goodwin's prior bad acts straightforwardly summarized her knowledge of his past misdeeds, previous thefts that had never risen to the level of armed robbery. Therefore, the door was not open for the Prosecution to make further inquiry into Goodwin's character during redirect examination in order to rebut her testimony. In addition, while Indiana Evidence Rule 608(b) allows inquiry on cross-examination of a witness into specific instances of conduct of the person about whose character the witness is testifying, the rule does not authorize the party calling the witness to inquire into specific instances of conduct nor introduce extrinsic evidence during direct or redirect examination. 13 Robert Lowell Miller, Jr., INDIANA EVIDENCE § 608.205 at 148 (2d ed.1995).

Nevertheless, the Prosecution began its redirect examination of VanScyoc with a series of questions into Goodwin's prior misconduct:

Q. What else have you known Chad to steal besides car stereos?

A. I know that he broke into a garage of a friend. I'm not sure of which one it was and took a big stereo and I'm not exactly sure what you call it but it goes with the stereo. I think it's a receiver and some big speakers and decks.

. . . .

Q. So he stole car stereos?

A. Yes.

Q. How many car stereos have you known him to steal?

A. Not very many. I'd say five, six at the most that I knew about or that I seen.

Q. Theft was one of his hobbies. Would that be a fair assumption?

A. Yes.

Q. You said you knew of a vehicle break-in that Chad had done. Stole compact disks, wallet, credit cards, tools. Is that correct?

A. Yes. I think that was the same night they robbed the Pantry or that Chad robbed the Pantry.

Q. Jeremy and Kristin Thomason?

A. Yes, I know them.

Q. What do you know about a car theft that involved Chad?

A. What do I know about a car theft that involved Chad?

BY THE STATE: With them, if anything.

A. Kristin claims that her car was stolen and she thought Chad had something to do with it but I've known Kristin to tell Jeremy things just so that he doesn't ask her why she was gone for days at a time.

Q. You don't know whether or not they had Chad steal that car for insurance purposes?

A. No. I don't know anything about that.

. . . .

Q. What about cellular phones. Has Chad stolen cellular phones in the past?

A. The ones that I know about I don't believe Chad took. I know of one that Chad took out of a vehicle.

Q. Do you remember a statement that you made to Detective Toney Mayhew that Chad had put up to twenty stolen cellular phone batteries into a storm sewer across from the house on Fredrick?

A. I made a comment to him that whenever Chad took a cell phone and he came into the bedroom where I was sleeping and was talking about it and then I know that we went back in the living room and I picked it up and I was looking at it and I also remember it rang or it beeped or did something and he told me to throw it in the sewer across the road. I wasn't going to do it so they threw it down there and when I asked why they did that one of the boys commented that that's what they do with all the stolen cell phones.

Q. So just to summarize you know that Chad steals car stereos, he burglarizes garages, he steals cell phones and his latest accomplishment as far as you know was armed robbery?

A. Yes.

Tr. p. 48–51. As no door had been opened during cross-examination into Goodwin's prior misconduct, this entire line of questioning into Goodwin's criminal career only served to taint Goodwin's reputation in the eyes of the jury.

The Prosecution resumed its questioning into Goodwin's prior bad acts during its direct examination of Kiselewski:

Q. What else have you known Chad to be involved in? Other thefts of burglaries or anything like that?

A. Just like car audio and stuff like that.

Q. He was known to steal things?

A. Yes.

Tr. p. 62–63. The Prosecution also questioned Ohning on direct examination about another theft that Goodwin had committed:

Q. Were you and Chad involved in an incident or a few incidents at Working Distributors?

A. Yes.

Q. Tell the jury about what happened there?

A. About the beer?

BY THE STATE: Yes.

A. We robbed a beer truck.

Q. Was that just a single occurrence? Did you do it just once or was it more than once?

A. I did it a couple of times.

Q. Was Chad with you?

A. One of the times, yes.

Q. Just that one time and you both got caught for that?

A. Yes.

. . . .

Q. Was Chad charged with the theft or burglary at Working Distributors along with you?

A. He was with me. I don't know nothing about his case.

Q. Were you both arrested for it?

A. Yes.

Tr. p. 82, 85. The Prosecution concluded its inquiry into Goodwin's other misdeeds with Officer Hamner, who testified in great detail about finding stolen property that had been taken from the garage of a nearby residence in Goodwin's house. Tr. p. 113–115.

While Goodwin's question to VanScyoc on cross-examination was invited error that does not warrant reversal, Goodwin's question did not open the door for the Prosecution to introduce character evidence during its redirect examination of VanScyoc, and it certainly was not the green light for the Prosecution to introduce other evidence of instances of Goodwin's bad deeds through its witnesses. However, Goodwin's defense counsel offered no objections while the Prosecution was eliciting character evidence. Therefore, the trial court had no opportunity to rule on the appropriateness of the character evidence, and Goodwin is left on appeal to argue that the introduction of the character evidence falls under the narrow definition of fundamental error.

 If a defendant does not object contemporaneously with the introduction of the evidence, appellate review of the issue is waived unless the admission of evidence constitutes fundamental error. *Sauerheber v. State*, 698 N.E.2d 796, 804 (Ind.1998). The fundamental error exception is extremely narrow. *Mitchell v. State*, 726 N.E.2d 1228, 1236 (Ind.2000), *reh'g denied*. To qualify as fundamental error, "an error must be so prejudicial to the rights of the defendant as to make a fair trial impossible." *Id.* (quoting *Willey v. State*, 712 N.E.2d 434, 444–45 (Ind. 1999)). To constitute fundamental error, the error "must constitute a blatant violation of basic principles, the harm or potential for harm must be substantial, and the resulting error must deny the defendant fundamental due process." *Id.* (quoting *Wilson v. State*, 514 N.E.2d 282, 284 (Ind. 1987)). As a general rule, the erroneous admission of evidence of extrinsic acts is not fundamental error. *Williams v. State*, 634 N.E.2d 849, 854 (Ind.Ct.App.1994).

 In this case, the amount of improper evidence of Goodwin's prior misdeeds admitted during his trial falls within the narrow definition of fundamental error. The underlying theme of the Prosecution's case was that theft was one of Goodwin's hobbies. As the Prosecution fashioned its case against Goodwin, it interwove relevant evidence of the crime for which Goodwin was actually on trial with an assortment of other alleged uncharged crimes all centering around Goodwin's propensity to steal. Because the evidence of Goodwin's criminal propensity led to the inference that he engaged in the charged conduct, we conclude that a fair trial was impossible in this case.

 The prohibition on the use of prior misconduct to prove a criminal case is "a basic tenet of criminal law older than the republic itself." *Thompson,* 690 N.E.2d at 235 (quoting *Lannan v. State,* 600 N.E.2d 1334, 1338 (Ind.1992)). Obviously, there are circumstances under Evidence Rule 404(b) where the admission of prior misconduct does not constitute error because the evidence of prior misdeeds is not introduced solely for the purpose of demonstrating a criminal propensity. Moreover, the limited introduction of improper character evidence in the face of substantial independent evidence of guilt will be considered harmless error. But when a case arises, such as this, where the blatant and persistent introduction of improper character evidence negates the due process presumption of innocence by firmly illustrating to the jury that the defendant has a criminal propensity leading undeniably to the additional inference that the defendant must have engaged in the charged criminal conduct, we will find the admission of the improper character evidence to be fundamental error. *See Rhodes v. State,* 771 N.E.2d 1246, 1256 (Ind.Ct.App.2002) (finding the admission of character evidence was fundamental error), *trans. denied; see also United States v. Levario Quiroz,* 854 F.2d 69, 74 (5th Cir.1988) (concluding that admission of character evidence was "plain error" [2]); *State v. Lawton,* 164 Vt. 179, 667 A.2d 50, 56 (1995) (concluding that admission of character evidence was "plain error" because the "error so affects the substantial rights of the defendant."); *State v. McCarthy,* 156 Vt. 148, 589 A.2d 869, 873 (1991) (concluding that admission of character evidence was "plain error"). When a fair trial is impossible because the trial has become more about the defendant's char-

acter than about the facts of the charged crime, the introduction of a defendant's prior misdeeds will be considered fundamental error. Therefore, we find that in this case, the introduction of improper character evidence constitutes fundamental error, and we reverse Goodwin's conviction.

 As a final matter, we note that the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution generally does not bar a retrial on the same crimes when reversal is due to trial error in the admission of evidence. *Thompson,* 690 N.E.2d at 237 (citing *Lockhart v. Nelson,* 488 U.S. 33, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988)). However, double jeopardy forbids a retrial—even where the defendant requests it as in this case—if the reviewing court concludes that the evidence is legally insufficient to support the conviction. *Id.* (citing *Champlain v. State,* 681 N.E.2d 696, 702 (Ind.1997)). Evidence is sufficient if the probative evidence and reasonable inferences drawn from the evidence could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt. *Id.* When reviewing the sufficiency of the evidence, we neither reweigh evidence nor judge witness credibility. *James v. State,* 755 N.E.2d 226, 229 (Ind.Ct.App.2001), *trans. denied.* Instead, we examine only the evidence favorable to the judgment, together with the reasonable inferences to be drawn therefrom. *Id.*

In this case, Alldredge testified that she witnessed Goodwin rob the Pantry while armed with a big stick. In addition, three of Goodwin's friends testified that he bragged about robbing the store. Therefore, we find that there was sufficient evidence from which the jury could have concluded that Goodwin committed armed

**2.** The term "plain error" is the equivalent of Indiana's "fundamental error." *State v. Eu-*

*banks,* 729 N.E.2d 201, 207 n. 4 (Ind.Ct.App. 2000), *reh'g denied, trans. denied.*

robbery. Thus, we remand this case for a new trial.

Judgment reversed and remanded.

RILEY, J., concurs.

BAKER, J., dissents with separate opinion.

BAKER, Judge, dissenting.

I respectfully dissent from the majority's holding that Goodwin's conviction for armed robbery must be reversed. In my view, the evidence regarding Goodwin's prior uncharged criminal misdeeds offered at trial did not amount to reversible error in light of the independent evidence that was presented to support Goodwin's conviction for the instant offense.

As the majority correctly posits, the erroneous admission of evidence of extrinsic acts is not fundamental error. *Williams v. State*, 634 N.E.2d 849, 854 (Ind.Ct.App. 1994). To show fundamental error, a defendant must show that the error was a substantial and blatant violation of basic principles, which rendered the result of the trial unfair. *Ben–Yisrayl v. State*, 690 N.E.2d 1141, 1150 (Ind.1997). Here, the majority has reversed Goodwin's conviction for the reason that the introduction of improper character evidence amounted to fundamental error. Such a conclusion is based upon the proposition that "[w]hen a fair trial is impossible because the trial has become more about the defendant's character than about the facts of the charged crime, the introduction of a defendant's prior misdeeds will be considered fundamental." Op. at ——. While I can embrace such a notion in some circumstances, that conclusion is not warranted in this case.

Even though the State introduced an assortment of other alleged uncharged crimes regarding Goodwin's propensity to steal—without objection—it is noteworthy that defense counsel's apparent strategy was to demonstrate to the jury that Goodwin was only a "small-time thief" and could not have committed such a "high-grade" offense as armed robbery. Moreover, even if it could be said that Goodwin's prior uncharged criminal acts were admitted in violation of Evid. R. 404(b), I would note that the remaining evidence offered at trial, independent of those prior offenses, was more than sufficient to establish Goodwin's guilt.

Specifically, Alldredge unequivocally identified Goodwin as the robber, and her testimony was uncontradicted. Tr. p. 8, 28. She testified that Goodwin was carrying a pool cue and described the gray sweatshirt and bandanna that he wore during the robbery. Tr. p. 3. Goodwin had taken approximately fifty or sixty dollars from the Pantry, and Alldredge noticed that Goodwin "had black electrical tape wrapped around each finger." Tr. p. 9.

As the majority observes, Goodwin also reported to several of his friends that he was intending to rob the store. Tr. p. 33, 59, 80–81. After committing the crime, Goodwin indeed told his friends he had robbed the Pantry and had covered his fingers with electrical tape so there would be no prints. Goodwin went on to describe what he had taken and then showed his friends the money and items that he had obtained in the robbery. Tr. p. 36–37, 60–61. Goodwin also told Amanda VanScyoc that he took a pool stick, tied a bandanna on his face and wore a hood when he committed the robbery. He also explained to her and another individual that he hit Alldredge and locked her in a freezer. Goodwin told them that he had deposited his sweatshirt, tape and pool cue in a dumpster after committing the crime. Tr. p. 36, 61.

Under these circumstances, even if it was error for the State to have offered the evidence of Goodwin's prior uncharged conduct at trial, it was not an error so prejudicial so as to make a fair trial of Goodwin impossible in light of the independent and overwhelming evidence establishing Goodwin's commission of the instant offense. As a result, I would affirm the conviction.